253 So.2d 356

Charles MANASSA, alias

v.

STATE.

6 Div. 119.

Court of Criminal Appeals of Alabama.

Oct. 5, 1971.

Jere Campbell, Tuscaloosa, for appellant.

MacDonald Gallion, Atty. Gen., and Robert E. Morrow, Asst. Atty. Gen., for the State.

PER CURIAM.

Appellant was indicted, tried and convicted in the Circuit Court of Tuscaloosa County for the offense of robbery and as punishment for said offense he was sentenced to imprisonment in the penitentiary for twelve years. Appellant's motion for a new trial was overruled. Hence, this appeal.

The trial was had on the indictment and appellant's pleas of not guilty and not guilty by reason of insanity. Before any witnesses testified the State and the defendant stipulated that when an objection is made no grounds therefor need be assigned, that when a motion to exclude is

made no grounds need be assigned, and that an objection carries with it a motion to exclude.

The testimony of the witnesses for the State tended to show that at about 2:30 A. M. on October 11, 1969, the Cannon Oil Company filling station was invaded by four Negro men and that James Pritchett, who was in charge of said station and in possession of the money and property of said company there situated, was robbed and $56.00 in currency and a coin changer, the property of said company, were taken from his person by said Negro men; that one of the four Negro men had a gun described by Pritchett as a ".44 or .45 automatic" and one of them had a knife with a five or six inch blade; that Pritchett saw both the gun and the knife; that the man with the knife held it at Pritchett's side and the man with the gun held it in his right hand and said, "We want your money;" that the man with the knife said, "Don't go for your gun;" that Pritchett pulled the coin changer off and took the money from his pocket and the men carried them away; and that they also took a .22 caliber pistol from him and carried it away.

The evidence further tended to show that the witness Pritchett had seen the man who had the gun and the man who had the knife before that night. He described the man with the knife as being tall and slim and the one with the gun as being shorter and heavier built. Pritchett also testified that the man with the gun at the time of the robbery had also been in that filling station that same night before the robbery and that he saw him then and that he had been in the station quite a few times before and he had waited on him; that he recognized him when he saw him as being someone he had waited on; that the man with the knife had been in the filling station twice that night before the robbery; and that he was last there about forty-five minutes before the robbery. He further testified that he saw the man who had the gun at the robbery in the court-

room and he pointed out the appellant in the courtroom as being that person. He also testified that the appellant took the money from him and that he was the man with the gun who participated in the robbery. There was no objection to the in-court identification of appellant.

The evidence also revealed that the police found appellant on the night of the robbery at 1525 17th Street in Tuscaloosa on the back porch and one Alfred Pastern next door at 1527 17th Street; that these houses were located some six and one-half blocks from the scene of the robbery; that about daylight of that night they found a .45 automatic pistol and $28.00 in money on the ground near the steps of the porch where they found appellant.

The evidence further revealed that Thomas Giles was the owner of the pistol found; that on the same night of the robbery, prior to the robbery, appellant came to Giles' home and asked him to lend him the pistol; that Giles refused; that in the presence of appellant Giles took the pistol and put it between some blankets in a back room; and that appellant went into said room, got the pistol and left his home with it. Giles identified the pistol found by police near the spot where appellant was found as being the pistol taken from his home by appellant. Giles told the police how appellant obtained possession of the pistol, but that came out when police stated to appellant his conversation with Giles.

The State's evidence further tended to show that Detective Dempsey Marcum was the officer who talked to Giles about the pistol and that after he talked with Giles he brought appellant to his office and talked to him. In that connection we quote from the record:

"A. On our return to the station, Charlie Manassa was in jail along with Alfred Pastern, and we got Charlie out and took him to our office, to the detective's office, from the jail, and quoted the Miranda warning to him, advised him of his constitutional rights.

"Q. Do you do that Miranda thing from a prepared piece of literature or something?

"A. Yes, we do.

"Q. Who was present at the time you told him his constitutional rights under the Miranda decision?

"A. Detective Harless, my partner, just the two of us, myself and Charlie Manassa, three of us.

"Q. Did you read him the card?

"A. Yes, sir.

"Q. Did you let him read it?

"A. No, sir, I read it to him.

"Q. Then did you read the reverse side as well?

"A. Yes, sir.

"Q. All right, tell the jury, read to the jury as you read it to him, please, sir.

"A. Miranda Warning. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.

"Q. All right, did you read the other side of it too?

"A. Yes, sir.

"Q. All right, sir.

"A. I asked him if he understood these rights.

"Q. And what did he say?

"A. He said he did.

"Q. Go ahead.

"A. And he said he had a lawyer but he didn't need one because he wasn't going to sign anything; said he would be glad to talk to us.

"Q. All right, said he didn't want a lawyer?

"A. That is right.

"Q. All right, go ahead and tell us. Did you tell him what he was charged with or suspected of?

"A. Yes.

"Q. All right, go ahead and tell what transpired there and then.

"MR. SKIDMORE: We object.

"THE COURT: You object?

"MR. LACKEY: If they want a hearing outside of the jury, they are entitled to it.

"THE COURT: Do you want to take him on voir dire?

"MR. SKIDMORE: No, sir, I don't want to take him on voir dire. I don't think Mr. Lackey has laid the proper predicate.

"MR. LACKEY: He is right.

"THE COURT: Go ahead.

"Q. Mr. Marcum, did he make a statement to you? Did he talk with you after you told him what his rights were under Miranda, what his rights were and of what he was supected, did he talk with you, not saying what he said?

"A. Yes, sir, he talked with us.

"Q. Now, before he made any statements at all, did you threaten him or coerce him in any way to get him to make a statement?

"A. No, sir.

"Q. Did you promise him anything or give him a reward or offer him a reward or hope of reward in order to get him to make a statement?

"A. No, sir, we did not.

"Q. All right, did you tell him it would be better for him or worse for him if he did or if he did not make a statement?

"A. We did not.

"Q. All right, now, what did he say?

"MR. SKIDMORE: I would like to take him on voir dire.

"MR. LACKEY: Let the record show he has not asked for an out of the presence of the jury hearing.

"THE COURT: You want it in the presence of the jury?

"MR. SKIDMORE: No, sir, I would like it out of the presence of the jury.

"THE COURT: Mr. Bailiff, take the jury out to the jury room, please, sir.

"(The jury then retired to the jury room, out of the presence and hearing of the court, at which time the following occurred:)"

Out of the presence of the jury counsel for appellant examined Detective Marcum and the substance of his testimony on voir dire was that he asked appellant if he had a previous arrest record; that appellant told Marcum he had a manslaughter case pending; and that Marcum asked appellant if he was on parole or probation. At that point counsel for appellant stated:

"Under these circumstances, we move that any statement made by Charlie Manassa at this time would be inadmissible on the ground that he had a form of coercion concerning his liberty in relation to other cases."

This motion was overruled. Thereupon the jury returned to the courtroom and counsel for appellant was offered an opportunity to examine the witness on voir dire in the presence of the jury but he stated he would just cross-examine him when the district attorney had completed his examination.

During the further examination of the witness Marcum by the district attorney as to his conversation with appellant the following occurred:

"Q. Just tell the Court and the jury what you told him that transpired between you and Giles.

"A. I told him I had been to see Giles and asked him what was him and his gun involved in now and that Giles started explaining to Detective Harless and myself that the previous night or morning, of that morning about one o'clock sometime, that Charlie and Pastern, Alfred Pastern, came to his house and came in and said they were talking to him and that Charlie asked him did he ever get his gun back and he told him yeah and he wanted to see it and he got it out from between the pillows of the bed and showed it to him and put it back, and he said that Charlie started easing over toward it and he took the gun out from under the pillow and took it back in the back bedroom some place and put it between some blankets and said the next thing he knew Charlie went back in the back room and that as he started to go back there the other boy—

"MR. SKIDMORE: What is the purpose in Detective Marcum testifying as to what Giles told him that he in turn told Manassa?

"MR. LACKEY: He is stating what he said in his conversation to Charlie Manassa.

"MR. SKIDMORE: But he said what Giles said.

"MR. LACKEY: We are not even saying that is what was said. He is not vouching for the fact that is what was said between him and Giles.

"THE COURT: My ruling is he can tell the conversation, what he told the Defendant and what the Defendant's response was.

"MR. LACKEY: That was my question.

"THE COURT: Yes, sir, just what he told the Defendant and what the Defendant said about what he told him.

"MR. LACKEY: Excuse me. Let me say one thing. At no point, Mr. Mar-

cum, make any statement that this is in fact what happened.

"MR. SKIDMORE: We object to coaching the witness on the stand.

"THE COURT: He can tell what the conversation was.

"MR. LACKEY: I was trying to avoid what I thought they wanted me to avoid.

"THE COURT: I overrule the objection. He can tell the conversation.

"Q. Go ahead and tell what your conversation to Manassa was.

"A. I was just relating to Manassa the conversation Giles and myself had had in regard to the gun.

"Q. All right, did you tell him that you had been to Giles' house?

"A. Yes, sir.

"Q. All right, and what did the defendant say about that?

"A. At first he said, 'I don't know anything about no gun,' and we talked on for a little bit and he hesitated and I talked to him about—I believe I talked to him about Pastern, how long he had known Pastern, and first one thing and another, and where he had been the previous night and things of that nature, and then he hesitated and I told him that I thought there wasn't any question as far as we were concerned, that Giles had also said he stole his gun and was going to sign a warrant for him about the gun.

"Q. All right, what did he say about Giles' gun, if anything?

"A. He looked real surprised then and said, 'We didn't steal it.'

"MR. SKIDMORE: We object to what he looked like.

"THE COURT: I exclude the statement, 'He looked surprised.'

"Q. What did he say?

"A. He arose to that right quick to say, 'We didn't steal it.'

"MR. SKIDMORE: We object to that.

"THE COURT: I exclude the statement that he arose to that.

"Q. What did he say? You made the statement and he made some reply.

"A. He said, 'We didn't steal it.'

"Q. Did he give you any further rundown on that part?

"A. Yes, sir.

"Q. What did he say?

"A. He said that he borrowed it.

"Q. And did he say when he borrowed it?

"A. He said he borrowed the gun the past night.

Q. All right, now, then, did he say anything beyond that about the robbery?

"A. Yes.

"Q. What did he say about the robbery at the service station?

"A. Then he started telling about the robbery and I asked him who the other people involved in it was and he paused a little bit and said his brother Robert and a Clements boy. I have forgotten Clements' name now."

We shall first address ourselves to the question of the admissibility of the confession of appellant. The facts in the instant case do not differ in legal significance from those in Embrey v. State, 283 Ala. 110, 214 So.2d 567.

 In the instant case the district attorney in questions addressed to Detective Dempsey Marcum, brought out that he had a conversation with appellant, not its contents, and that the *Miranda* warning was given appellant and at that point the dis-

trict attorney propounded the usual questions as to the voluntariness of the confession. It was at that point that a hearing was had outside the presence of the jury and in that hearing counsel for appellant was concerned solely with whether the fact that appellant, having had a police record and another pending case, was under "a form of coercion." He in no way attempted to show the proper warning was not given appellant before the confession. Under such circumstances there was no error in the admission of the confession. If appellant had another case pending such would not have coerced him into a confession in the instant case. If anything, it would have had the very opposite effect. The trial court was justified in holding that the State had met the burden imposed on it to overcome the presumption that the confession was not voluntarily given.

Appellant does not on this appeal complain that a full hearing, out of the presence of the jury, on the question of the voluntariness of the confession was not had. If there was any error in that respect it was invited by appellant. Such cannot be made the basis of reversible error. See Woods v. State, 39 Ala.App. 513, 104 So.2d 760.

Appellant also complains that the statements made by Detective Marcum to appellant in which he related his conversation with Giles, the owner of the pistol, is hearsay and therefore inadmissible. Marcum was not testifying to the truthfulness of what Giles had told him. He was merely testifying to what he, Marcum, told the defendant. That is not hearsay.

Another complaint of appellant is the admission in evidence of the facts that he had a police record and that he had another case pending. This evidence was brought forth by questions propounded by counsel for appellant and cannot be made the basis of error.

In accordance with Tit. 15, § 389, Code of Alabama, 1940, as amended 1958, we have carefully reviewed the record on this appeal and find no error contained therein. The judgment appealed from is therefore due to be affirmed.

The foregoing opinion was prepared by L. S. Moore, Supernumerary Circuit Judge, and adopted by this Court as its opinion.

Affirmed.